United States Court of Appeals,
Fourth Circuit.
UNITED STATES of America, Plaintiff–Appellee,
v.
David Jack VOGT, Jr., Defendant–Appellant.

No. 88–5007.
Argued June 6, 1989.
Decided July 26, 1990.
Rehearing Denied Aug. 16, 1990.

Defendant was convicted of violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) in connection with the use or investment of income derived from pattern of racketeering activity in enterprise engaged in or affecting interstate or foreign commerce and of conspiracy to impede the Internal Revenue Service in the ascertainment, computation and collection of federal income taxes, by the United States District Court for the Middle District of North Carolina, Frank W. Bullock, Jr., J., by jury verdict. Defendant appealed. The Court of Appeals, Phillips, Circuit Judge, held that: (1) evidence was sufficient to support conviction on the RICO charge; (2) statute of limitations for the RICO prosecution began on date of last act of "use or investment" of illegally derived funds or their proceeds in the "establishment or operation" of enterprise, rather than on date of last predicate act of racketeering charged; (3) RICO prosecution was not time barred; and (4) evidence was sufficient to support conspiracy conviction.

Affirmed.

See also, 713 F.Supp. 847.

West Headnotes

**[1] Criminal Law 110 662.10**

110 Criminal Law
110XX Trial
110XX(C) Reception of Evidence
110k662 Right of Accused to Confront Witnesses
110k662.10 k. Confessions or declarations of codefendants. Most Cited Cases

**Criminal Law 110 673(4)**

110 Criminal Law
110XX Trial
110XX(C) Reception of Evidence
110k673 Effect of Admission
110k673(4) k. Limiting effect of evidence competent only as against one of several defendants. Most Cited Cases

Admission of nontestifying codefendant's statement did not violate defendant's confrontation clause right, in prosecution for violation of the Racketeer Influenced and Corrupt Organizations Act, where defendant's name was replaced by word "client" and where jury was given cautionary instruction indicating that statement could only be considered against nontestifying codefendant; although statement's incriminating import was inferable from other evidence that earlier had been properly admitted against defendant, statement did not "on its face" incriminate defendant, and although it might not have been easy for jury to obey the cautionary instruction, there did not exist the overwhelming probability of their inability to do so. 18 U.S.C.A. § 1962(a); U.S.C.A. Const.Amend. 6.

**[2] Criminal Law 110 1036.1(6)**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

110 Criminal Law
110XXIV Review
110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1036 Evidence
110k1036.1 In General
110k1036.1(3) Particular Evidence
110k1036.1(6) k. Documentary evidence. Most Cited Cases

Any error in admission of fingerprint card for purposes of establishing defendant's use of alias in certain documents was not plain error, in prosecution for violating the Racketeer Influenced and Corrupt Organizations Act; defendant later stipulated that he had used alias in making some purchases of assets relevant to proof of charges against him. 18 U.S.C.A. § 1962(a); Fed.Rules Evid.Rule 103(a)(1), (d), 28 U.S.C.A.

**[3] Criminal Law 110 ⚷1153.3**

110 Criminal Law
110XXIV Review
110XXIV(N) Discretion of Lower Court
110k1153 Reception and Admissibility of Evidence
110k1153.3 k. Relevance. Most Cited Cases
(Formerly 110k1153(1))

Assessments of evidence's relevance and countervailing considerations of risks of unfair prejudice and confusion are committed to broad discretion of trial judges. Fed.Rules Evid.Rules 401, 403, 28 U.S.C.A.

**[4] Criminal Law 110 ⚷338(7)**

110 Criminal Law
110XVII Evidence
110XVII(D) Facts in Issue and Relevance
110k338 Relevancy in General
110k338(7) k. Evidence calculated to create prejudice against or sympathy for accused. Most Cited Cases

**Criminal Law 110 ⚷368.20**

110 Criminal Law
110XVII Evidence
110XVII(F) Other Misconduct by Accused
110XVII(F)2 Admissibility in Prosecutions for Particular Offenses in General
110k368.20 k. Conspiracy, racketeering, and money laundering. Most Cited Cases
(Formerly 110k369.2(3.1), 110k369.2(3))

Testimony regarding comments made and trips taken by defendant which suggested defendant's knowledge of and participation in illegal conduct, evidence of defendant's use of false identification and aliases, and photographs of expensive contents of safety deposit box linked to defendant were admissible in prosecution for violating the Racketeer Influenced and Corrupt Organizations Act; considered separately or cumulatively, all the evidence was relevant in varying degrees to critical issues in the case, and even when considered for their cumulative effect, evidence could not be thought to pose any real risk of unfair prejudice or confusion sufficient to outweigh their probative value. Fed.Rules Evid.Rules 401, 403, 28 U.S.C.A.; 18 U.S.C.A. § 1962(a).

**[5] Criminal Law 110 ⚷867.12(9)**

110 Criminal Law
110XX Trial
110XX(J) Issues Relating to Jury Trial
110k867 Discharge of Jury Without Verdict; Mistrial
110k867.12 Evidentiary Matters

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

110k867.12(6) Other Misconduct; Character of Accused
110k867.12(9) k. Incarceration. Most Cited Cases
(Formerly 110k867)

Testimony that witness met defendant in jail did not entitle defendant to mistrial, in prosecution for violation of the Racketeer Influenced and Corrupt Organizations Act; district court instructed jury that defendant was being held pretrial because he was Canadian citizen, not because of any prior convictions, and it was "highly probable" that the careless elicitation of the testimony did not affect the judgment. 18 U.S.C.A. § 1962(a).

**[6] Criminal Law 110 ⚷1144.13(3)**

110 Criminal Law
110XXIV Review
110XXIV(M) Presumptions
110k1144 Facts or Proceedings Not Shown by Record
110k1144.13 Sufficiency of Evidence
110k1144.13(2) Construction of Evidence
110k1144.13(3) k. Construction in favor of government, state, or prosecution. Most Cited Cases

**Criminal Law 110 ⚷1159.2(7)**

110 Criminal Law
110XXIV Review
110XXIV(P) Verdicts
110k1159 Conclusiveness of Verdict
110k1159.2 Weight of Evidence in General
110k1159.2(7) k. Reasonable doubt. Most Cited Cases

On challenge to sufficiency of the evidence to support determination that defendant violated the Racketeer Influenced and Corrupt Organizations Act, Court of Appeals considers evidence in light most favorable to the Government and asks whether, considering it in that light, any rational finder of fact could have found the essential elements of the crime beyond reasonable doubt. 18 U.S.C.A. § 1962(a).

**[7] Racketeer Influenced and Corrupt Organizations 319H ⚷93**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(C) Criminal Remedies and Proceedings
319Hk92 Evidence
319Hk93 k. Presumptions and burden of proof. Most Cited Cases

To prove offense charged under the Racketeer Influenced and Corrupt Organizations Act, the Government had burden to prove that defendant derived income from pattern of racketeering activity and that defendant used or invested, directly or indirectly, some part of that income in the establishment and operation of enterprise which was engaged in or affected commerce by its activities. 18 U.S.C.A. § 1962(a).

**[8] Racketeer Influenced and Corrupt Organizations 319H ⚷95**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(C) Criminal Remedies and Proceedings
319Hk92 Evidence
319Hk95 k. Weight and sufficiency. Most Cited Cases

Evidence was sufficient to support jury's determination beyond reasonable doubt that defendant used

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

or invested at least part of bribe money received from drug smuggler, or some part of proceeds of that income, in the establishment or operation of multicorporation laundering enterprise, or at least some portion of it, charged in the indictment, and, thus, was sufficient to support conviction for violation of the Racketeer Influenced and Corrupt Organizations Act; the Act did not require that the tainted income be specifically and directly traced in proof from its original illegal receipt to its ultimately proscribed "use or investment" by the defendant. 18 U.S.C.A. § 1962(a).

**[9] Criminal Law 110 ⚷147**

110 Criminal Law
110X Limitation of Prosecutions
110k147 k. Limitations applicable. Most Cited Cases

The Racketeer Influenced and Corrupt Organizations Act (RICO) does not contain its own statute of limitations; criminal RICO prosecutions therefore are governed by catch-all, five-year federal statute of limitations. 18 U.S.C.A. §§ 1961 et seq.,3282.

**[10] Criminal Law 110 ⚷150**

110 Criminal Law
110X Limitation of Prosecutions
110k148 Commencement of Period of Limitation
110k150 k. Continuing offenses. Most Cited Cases

When legislatively intended "unit of prosecution" under criminal statute is "course of conduct," rather than "multiplicity of offenses" making up the conduct, limitations triggering event is perforce the concluding act in the course of conduct alleged.

**[11] Criminal Law 110 ⚷150**

110 Criminal Law
110X Limitation of Prosecutions
110k148 Commencement of Period of Limitation
110k150 k. Continuing offenses. Most Cited Cases

Five-year statute of limitations for prosecution for violation of statute prohibiting the use or investment of income derived from pattern of racketeering activity in enterprise engaged in or affecting interstate or foreign commerce began to run on date of last act of use or investment, rather than on date of last predicate act of racketeering activity, in prosecution premised upon use or investment of bribe money received from drug smuggler. 18 U.S.C.A. § 1962(a).

**[12] Criminal Law 110 ⚷150**

110 Criminal Law
110X Limitation of Prosecutions
110k148 Commencement of Period of Limitation
110k150 k. Continuing offenses. Most Cited Cases

Prosecution for violation of the Racketeer Influenced and Corrupt Organizations Act was not time barred by insufficiency of evidence to prove act of use or investment of tainted funds within charging period; evidence was sufficient to support inference from conceded or unchallenged facts that asset purchases and transfers effected in transactions, which occurred during the charging period, were effected directly by or on behalf of defendant, rather than by the "enterprise" corporations acting independently of defendant, that in the transactions the corporations were used as dummies or alter egos of defendant specifically to conceal source of tainted funds, and that funds and assets involved in all of the transactions proven were, at least in part, either income or receipts of income derived from bribe money received from drug smug-

gler. 18 U.S.C.A. § 1962(a).

**[13] Criminal Law 110 ⚷1173.2(1)**

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1173 Failure or Refusal to Give Instructions
110k1173.2 Instructions on Particular Points
110k1173.2(1) k. In general. Most Cited Cases

Any error in refusing requested instruction requiring proof by the Government of act of investment or use within charging period was harmless, in prosecution for violation of the Racketeer Influenced and Corrupt Organizations Act by use or investment of income derived from pattern of racketeering activity in enterprise engaged in or affecting interstate or foreign commerce; evidence was sufficient to support inference from conceded or unchallenged facts that asset purchases and transfers effected by transactions occurring during charging period were effected directly by or on behalf of defendant. 18 U.S.C.A. § 1962(a).

**[14] Criminal Law 110 ⚷1172.1(3)**

110 Criminal Law
110XXIV Review
110XXIV(Q) Harmless and Reversible Error
110k1172 Instructions
110k1172.1 In General
110k1172.1(2) Particular Instructions
110k1172.1(3) k. Elements and incidents of offense; definitions. Most Cited Cases

Error in instructing jury that it need not find that there was any connection or relation between racketeering acts and that it need find only that the defendant derived income from at least two of the charged racketeering acts committed within ten years of each other was harmless, in prosecution for violation of the Racketeer Influenced and Corrupt Organizations Act; only predicate acts charged in indictment were eight violations of statute prohibiting the receipt of bribes by public officials, and all acts charged occurred between December 1976 and August 1978 and involved the same bribe payment transactions between the same parties, and, thus, any pattern found by jury must have been drawn from those obviously related acts. 18 U.S.C.A. §§ 201(c)(3), 1962(a).

**[15] Indictment and Information 210 ⚷201**

210 Indictment and Information
210XV Aider by Verdict
210k201 k. Applicability of doctrine in general. Most Cited Cases

When postverdict challenge to sufficiency of indictment is made, every intendment is indulged in support of sufficiency; question is only whether the necessary facts appear in any form or by fair construction can be found within its terms.

**[16] Indictment and Information 210 ⚷202(5)**

210 Indictment and Information
210XV Aider by Verdict
210k202 Defects Cured
210k202(5) k. Insufficiency of accusation in general. Most Cited Cases

Where postverdict challenge to indictment relates to absence of element, indictment will be held sufficient if it contains words of similar import.

**[17] Indictment and Information 210 ⚷202(5)**

210 Indictment and Information

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

210XV Aider by Verdict
210k202 Defects Cured
210k202(5) k. Insufficiency of accusation in general. Most Cited Cases

"Fair construction" of terms of indictment charging defendant with "impeding, impairing, obstructing and defeating" the Internal Revenue Service, when coupled with specific allegations of money laundering and false tax returns, presented the necessary facts within the terms of the indictment to state offense under statute making it crime to conspire to defraud the United States; challenge to sufficiency of the indictment was made postverdict. 18 U.S.C.A. § 371.

**[18] Criminal Law 110 147**

110 Criminal Law
110X Limitation of Prosecutions
110k147 k. Limitations applicable. Most Cited Cases

Six-year statute of limitations governs conspiracies to impede the Internal Revenue Service in the ascertainment, computation and collection of federal income taxes. 18 U.S.C.A. § 371; 26 U.S.C.A. § 6531(1, 8).

**[19] Criminal Law 110 150**

110 Criminal Law
110X Limitation of Prosecutions
110k148 Commencement of Period of Limitation
110k150 k. Continuing offenses. Most Cited Cases

Objectives of conspiracy to impede the Internal Revenue Service in the ascertainment, computation and collection of federal income taxes were not attained on date allegedly inaccurate returns were filed, or due if they were not filed, but, rather, conspiracy would not be successful unless source of unreported income was concealed until action thereon was barred and evasion of taxes permanently effected; therefore, evidence of overt acts, which were designed to conceal source of unreported income and which occurred within six-year statute of limitations period, was sufficient to defeat timeliness challenge to the conspiracy prosecution. 18 U.S.C.A. § 371; 26 U.S.C.A. § 6531(1, 8).

**[20] Conspiracy 91 33(7)**

91 Conspiracy
91II Criminal Responsibility
91II(A) Offenses
91k33 Conspiracy to Defraud Government
91k33(2) Particular Offenses and Acts
91k33(7) k. Relating to customs or revenue laws. Most Cited Cases

Conviction for conspiracy to impede the Internal Revenue Service (IRS) in the ascertainment, computation and collection of federal income taxes cannot stand unless agreed upon objective of the criminal conspiracy is to thwart the IRS's efforts to determine and collect income taxes; if impeding the IRS is only collateral effect of agreement, rather than one of its purposes, then the conspiracy conviction cannot stand. 18 U.S.C.A. § 371.

**[21] Conspiracy 91 33(7)**

91 Conspiracy
91II Criminal Responsibility
91II(A) Offenses
91k33 Conspiracy to Defraud Government
91k33(2) Particular Offenses and Acts
91k33(7) k. Relating to customs or revenue laws. Most Cited Cases

Conspiracy to impede the Internal Revenue Ser-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

910 F.2d 1184, 30 Fed. R. Evid. Serv. 743
**(Cite as: 910 F.2d 1184)**

vice in the ascertainment, computation and collection of federal income taxes is comprised of three elements: existence of agreement, overt act by one conspirator in furtherance of agreement's objectives, and intent on part of conspirators to agree, as well as to defraud the United States. 18 U.S.C.A. § 371.

**[22] Conspiracy 91 ⚷47(9)**

91 Conspiracy
91II Criminal Responsibility
91II(B) Prosecution
91k44 Evidence
91k47 Weight and Sufficiency
91k47(3) Particular Conspiracies
91k47(9) k. Internal revenue violations. Most Cited Cases

Evidence of inaccurate and false tax returns, indications of tax evasion, and continuous concealment in deceitful way provided sufficient basis for conviction for conspiracy to impede the Internal Revenue Service in the ascertainment, computation and collection of federal income taxes, in prosecution arising out of defendant's failure to include bribe money on federal income tax returns. 18 U.S.C.A. § 371.

**[23] Conspiracy 91 ⚷24(6)**

91 Conspiracy
91II Criminal Responsibility
91II(A) Offenses
91k23 Nature and Elements of Criminal Conspiracy in General
91k24 Combination or Agreement
91k24(4) Necessity of Culpable Coconspirator
91k24(6) k. Effect of acquittal, dismissal, or discharge of alleged coconspirator. Most Cited Cases

Acquittal of coconspirators named in indictment, which charged conspiracy to impede the Internal Revenue Service in the ascertainment, computation and collection of federal income taxes, did not preclude defendant's conviction for the conspiracy; even where all but one of the charged coconspirators are acquitted, verdict against one may nevertheless stand, and sufficient evidence existed of conspiracy between defendant and acquitted coconspirators to uphold jury's verdict against defendant. 18 U.S.C.A. § 371.

***1187** Harry Martin Solomon, Miami, Fla., for defendant-appellant.

David Bernard Smith, Asst. U.S. Atty., argued (Robert H. Edmunds, Jr., U.S. Atty., Greensboro, N.C., on brief), for plaintiff-appellee.

Before RUSSELL, PHILLIPS, and MURNAGHAN, Circuit Judges.

PHILLIPS, Circuit Judge:

David Jack Vogt, Jr. appeals from a final judgment and commitment order entered on a jury verdict finding him guilty of a RICO violation under 18 U.S.C. § 1962(a), and of conspiring to defraud the government in violation of 18 U.S.C. § 371. We affirm his conviction on both counts.

I

In the light most favorable to the government, the critical facts, in summary, are as follows.

Vogt was a United States Customs Service officer stationed in South Florida from 1971 through early 1979. In May of 1974, Vogt arrested Philip Keidaish III, a member of a drug smuggling ring, for a sojourn ***1188** violation. Some time later the two men struck a deal under which Keidaish paid Vogt substantial sums of money in return for Vogt's giving Keidaish Customs Service information that facilitated Keidaish's drug smuggling operation. This arrangement was in effect from late 1976 until late 1978 when Keidaish

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

910 F.2d 1184, 30 Fed. R. Evid. Serv. 743
**(Cite as: 910 F.2d 1184)**

got out of the smuggling business. During this time Vogt was paid between $500,000 and $800,000 for his services, usually in payments of around $100,000 following each smuggling operation for which Vogt gave assistance. Vogt was a member of the Customs Service throughout this period until early 1979 when he was granted a pensioned disability retirement.

At some point in their relationship, Keidaish and Vogt discussed the possibility of using foreign bank accounts and corporate entities as a means of "laundering" Vogt's illegally obtained money. Following up on this, Keidaish introduced Vogt to Burton R. Levey, a Miami attorney, whose firm, by the use of foreign banks and foreign and domestic corporations, had assisted Keidaish in concealing and using funds generated by his smuggling operations. From that point on, Levey assisted Vogt in an elaborate scheme of concealment of the source of the funds while facilitating Vogt's access to and use of those funds and their proceeds for his private purposes.

The basic mode of operation of the scheme was as follows. Vogt's illegally obtained money was deposited in various foreign bank accounts in the Grand Cayman Islands and the Netherlands Antilles. From those accounts it was withdrawn from time to time and funnelled through various trust accounts maintained by Levey's law firm and associated law firms and through several foreign and domestic corporations, some formed by Levey or at his direction, ultimately to be used by Vogt for a variety of investments, loans, and luxury purchases. Five corporations, either formed by or at Levey's direction, or sometime clients of his firm, were utilized: Real Tech International, Ltd., chartered in Grand Cayman, British West Indies; Chardon Company NV, chartered in Curacao, Netherland Antilles; and Silver Realty Corporation, Continental Aero Marine, Inc., and Costalotta, Inc., all chartered in North Carolina, where Vogt maintained his residence and engaged in various ventures following his retirement from the Customs Service in 1979. Also participating in the scheme's functioning, whether or not as culpable principles, were Darryl Myers, a Grand Cayman attorney, William C. Ray, a North Carolina attorney, both of whom were associated from time to time in transactions directed by Levey for Vogt's benefit, and Harvey Mitchell, a Burlington, North Carolina, automobile dealer and entrepreneur, who engaged in a variety of investment, purchase/sale and credit transactions with Vogt.

Some specific examples of the scheme's operation using these corporations, law firm trust accounts, and foreign bank accounts suffice to illustrate its intended and actual function.

---

In July of 1978, Vogt, having received over $500,000 in bribe money over the preceding two years, was introduced to Mitchell as a prospective purchaser of Mitchell's Colonial Manor apartment complex in Greensboro, North Carolina. Vogt and Mitchell negotiated a purchase price of $125,000 cash plus the assumption of two mortgages. One of the mortgages, with a balance of around $174,000, was held by Planters Bank, which demanded a financial statement from Vogt in connection with the planned assumption of their mortgage. Vogt declined to provide it. During the closing transactions in late 1978, Vogt participated as ostensible representative of Chardon Company NV, the Netherlands Antilles corporation which had just been formed under Levey's direction in late November of 1978. In the closing, Vogt paid $100,000 in cash, another $25,000 was paid from a local attorney's trust account, and the Planters Bank mortgage was not assumed, as originally agreed, but paid off in full by Vogt using a Chardon Company NV check drawn on an account in the Bank of Nova Scotia, Grand Cayman, British West Indies. Chardon Co. took a second mortgage***1189** on the property to secure this advance. Some two years later, in late 1980, Vogt sold the Colonial Manor complex for $1,425,000. After payment of the Chardon Co. mortgage and another, this yielded Vogt and his wife a profit of around $653,000. The settlement check to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Chardon Co. was returned to Grand Cayman and deposited, over Attorney Myers' endorsement, in the Bank of Nova Scotia, from whence the original advance had come.

---

In April 1979, Levey opened a new law firm trust account in the name of Silver Realty Corporation. In May 1979, such a corporation was chartered, by Levey's direction, in North Carolina, where Vogt was by then settled. It thereafter served as the conduit for purchases and as the nominal holder of title to a number of vehicles, essentially luxury and recreational types, which were bought by Vogt for cash and delivered to him personally. Immediately after its formation, Vogt transferred to this corporation the title to an FMC motor home which he had purchased for $32,000 cash in August 1978. A month later, in June 1979, Vogt bought a new Jeep for over $8,000 cash and titled it to this corporation. The next year, 1980, he traded the 1979 Jeep, which had been damaged on a coastal fishing expedition, for a new 1980 Dodge Omni which was titled by Vogt's direction to the friend who had introduced Vogt to Mitchell. Silver Realty received nothing in exchange for the 1979 Jeep, but in February 1980, Vogt bought and took delivery of a new 1980 Jeep which by Vogt's direction was billed and titled to Silver Realty. (As an aside to these recreational vehicle purchases, it may be noted that in March of 1980, Vogt purchased for cash a Cadillac De Ville, which eight months later, in November 1980, he traded in on a new 1981 Cadillac, for which boot of $14,000 was paid by a check on the Colonial Manor account, with title being put in the name of Vogt's parents in Florida.)

---

In August of 1979, Vogt arranged a loan of $50,000 to Mitchell, to be secured by a second mortgage on Mitchell's Greensboro residence. The loan proceeds were provided by a $50,000 Chardon Co. check drawn on its Nova Scotia Bank account, payable to Mitchell, which was deposited in the Levey firm trust account, from which the net loan proceeds of some $48,500 were then disbursed to Mitchell. Chardon Co.'s advance was secured by a second mortgage on the residence.

Some three months later, in November 1979, Mitchell transferred this residence, in a deal personally negotiated and handled through closing by Vogt, for $175,000 cash plus assumption of mortgages. A part of the cash component of the purchase price was provided out of a check for $115,000, payable to Mitchell, from a Levey law firm trust account (the balance going for the purchase of two Mercedes automobiles from Mitchell). By Vogt's direction, titles to the Mitchell residence and the two Mercedes were put in the name of Real Tech International, one of Levey's off-shore corporate clients. Thereafter Vogt had free use of the vehicles, one of which was kept at the Mitchell residence.

After this sale, Mitchell remained in occupancy of the residence under an agreement with Vogt by which Mitchell continued to pay the taxes, utilities, insurance and the mortgage payments to Chardon Co. and the Federal Land Bank, holder of the first mortgage, as a form of rent. In April 1981, Mitchell and Vogt entered into a written agreement giving Mitchell a one-year option to repurchase the residence. Vogt signed this option agreement in his individual capacity, and at the same time directed Mitchell to deliver to William C. Ray, Vogt's local attorney, a 1981 Cadillac Eldorado in discharge of accrued interest of $16,000 that Mitchell then owed on the Chardon Co. second mortgage on the property.

Mitchell did not exercise the option and in July of 1982, was pressed by Ray, Vogt's attorney, for payment of his share of the annual installment on the Federal Land Bank mortgage. After an unsuccessful effort to negotiate with Vogt, through Ray, a ***1190** repurchase of the residence for $100,000 in South African kruggerands in August or September of 1982, Mitchell made a payment to Ray for his share of the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

mortgage installment due the Federal Land Bank, then vacated the residence in October 1982. Ray remitted the payment then due to the Federal Land Bank and directed that the billing be changed to Real Tech International, which would assume the mortgage. When the Federal Land Bank declined to recognize a formal assumption of the mortgage by Real Tech International, Ray directed that future billings be made in the name of Ray and Mitchell, care of Ray. The Federal Land Bank had not earlier been notified of the transfer of title from Mitchell to Real Tech International. Around four months later, in February of 1983, Ray, signing as attorney-in-fact for Real Tech International, notified the Federal Land Bank that the property had been transferred to Vogt's parents who then formally assumed the outstanding mortgage balance of around $70,000, which was satisfied in full shortly thereafter.

---

In July of 1981, Costalotta, Inc., was incorporated by attorney Ray in North Carolina. Earlier in that month Vogt, with his wife, had visited a national “rally” of motor home owners in Denver, Colorado, and there ordered from Mitchell, who was in attendance as a dealer, a new 40–foot Bluebird Motorhome with a list price of around $280,000. A $20,000 deposit on this purchase was later made by Ray with a check in that amount drawn on a Guiness Mahon Cayman Trust Ltd. account. The original receipt for this deposit was made out to Vogt, but by Ray's direction Vogt's name was marked out and Costalotta, Inc. substituted. Ray paid the balance due of $186,121.80 with a check drawn on Scotiabank, The Bank of Nova Scotia, Grand Cayman. In December 1981, the motorhome was delivered to Vogt personally, but was titled to Costalotta, Inc. Ray signed the transfer documentation papers as President of Costalotta. In July 1982, Mitchell repurchased the motorhome from Vogt as a result of direct negotiations with Vogt. Payment was by a cashier's check for $185,000, payable to Costalotta, Inc. This check was given to Vogt and then assigned by special endorsement of Ray, as President of Costalotta, to Real Tech International, and was then deposited by Real Tech in the Bank of Nova Scotia account.

As indicated, these are but some examples of Vogt's use of foreign bank accounts, foreign and domestic corporations, and law firm trust accounts to conceal and make available for his personal use and investment the original bribe money in excess of a half million dollars that he had received from Keidaish together with proceeds from that money. Other examples of his laundering activities by these means during the period 1978–1982 abounded in the evidence. A few only may be noted in this summary.

His wife received periodic checks in amounts of $3,000 and $4,000 from various ones of the off-shore accounts, and deposited them in her joint account with Vogt. Nine months after Vogt caused title to the two Mercedes to be placed in Real Tech International, they were “sold” to Vogt's wife at substantial discounts. In addition to the fleet of recreational and luxury land vehicles which Vogt purchased and titled to Real Tech International, Silver Realty, and Costalotta, Inc., Vogt also purchased an expensive boat and airplane during this period. The boat was purchased on January 18, 1980, for $62,164 with a cashier's check funded by a Levey trust account, titled in the name of Real Tech International, and used for pleasure by Vogt. The airplane was purchased by Vogt in September 1980 for $122,500 plus a trade-in. Vogt paid the cash portion of the purchase price with a Levey trust account check, and had title put in Continental Aero–Marine, a North Carolina corporation that had been chartered in May 1980, by Ray at Levey's direction. Vogt took delivery and used the plane thereafter as he cared to do. As an added concealment device, Vogt used the alias “Jim Owens” in a number of purchase/sale transactions.

During this period, Vogt's income tax returns of course reported no such sums of ***1191** money as he received in bribes from Keidaish, instead reporting rather modest sums from investments in otherwise

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

unidentified “island accounts” and from operation and ultimate sale of the Colonial Manor property.

In October of 1986, a federal grand jury in the Middle District of North Carolina returned an indictment charging Vogt, Levey, and Ray with a single count of conspiracy to impede the Internal Revenue Service in the ascertainment, computation and collection of federal income taxes in violation of 18 U.S.C. § 371, (a “*Klein* ” conspiracy),[FN1] based on the conduct above summarized. On January 5, 1987, a multi-count superseding indictment was filed. Count I charged Vogt alone with a substantive RICO violation under 18 U.S.C. § 1962(a); Count II charged Vogt, Levey, and Ray with conspiracy to violate § 1962(a); Count III repeated the *Klein* conspiracy charge against Vogt, Levey, and Ray.

FN1. *United States v. Klein,* 247 F.2d 908 (2d Cir.1957).

Following a two-month trial in which Keidaish and Mitchell were principal witnesses for the government against Vogt and the other defendants, the jury found Vogt guilty on Counts I (substantive RICO violation) and III (*Klein* income tax conspiracy), but not guilty on Count II (RICO conspiracy). The jury found both Levey and Ray not guilty on either of the counts under which they were charged, Count II (RICO conspiracy) and Count III (*Klein* conspiracy).

This appeal by Vogt followed.

Vogt assigns a number of errors, some going to his conviction on both counts, some confined to one or the other. Going to both counts are challenges to a number of evidentiary rulings. Going separately to the RICO count are challenges to the sufficiency of the evidence to convict, to the court's refusal to dismiss the count as facially time barred and the court's related refusal to direct acquittal for failure to prove timeliness of the prosecution, and to the court's RICO “pattern” jury instructions. Going separately to the *Klein* conspiracy count are challenges to the legal sufficiency of the indictment, the sufficiency of the evidence to convict, and the district court's refusal to dismiss the claim as facially time-barred. We take these in the order noted.

## II

We first consider briefly a number of challenges to evidentiary rulings, presumably urged as tainting the convictions on both counts. None amounts to prejudicial error.

### A

[1] The first, relying on *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), contests the admission of a statement made by a non-testifying co-defendant to a government agent. The government proffered the testimony of the agent that the attorney co-defendant had told the agent in 1986 that in 1982 he, the co-defendant, had gone to Canada to look for “information concerning his client, David Vogt's, birth certificate.” When Vogt objected on *Bruton* grounds, the court admitted the testimony with Vogt's name redacted and gave a cautionary instruction that it could only be considered against the non-testifying co-defendant.

*Bruton* of course held that the admission of a non-testifying co-defendant's statement inculpating a defendant by name violated the defendant's confrontation clause right, even if a cautionary instruction is given. *See Bruton,* 391 U.S. at 126, 88 S.Ct. at 1622. More recently, however, the Court has declined to extend this rule to the situation where a defendant's name is redacted, even though the statement's application to him is linked up by other evidence properly admitted against the defendant. *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Specifically reserved, however, was the issue raised here, whether *Bruton*'s protection applies where the defendant's name is replaced by a symbol or neutral pronoun, ***1192** here “client.” *Id.* at 211 n. 5, 107 S.Ct.

at 1709 n. 5.

Based on the reasoning in *Richardson,* we think *Bruton* did not bar admission of the redacted statement here. Critically, it did not "on its face" incriminate Vogt, though its incriminating import was certainly inferable from other evidence that earlier had been admitted properly against him. In such a situation, though it may not be easy for a jury to obey the cautionary instruction, "there does not exist the overwhelming probability of their inability to do so that is the foundation of *Bruton*'s [rule]." *Id.* at 208, 107 S.Ct. at 1708; *see also United States v. Mechanik,* 735 F.2d 136, 141 (4th Cir.1984), *aff'd in relevant part,* 475 U.S. 66, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986); *United States v. Seni,* 662 F.2d 277, 282 (4th Cir.1981).

B

[2] Next Vogt challenges the admission in evidence of a fingerprint card for the purpose of establishing his use of an alias in certain documents. Although counsel for one of his co-defendants objected initially to the admission, Vogt's counsel did not; in fact when the court ordered redaction of certain incriminating information on the card, Vogt's counsel indicated a desire to have the card admitted without redaction. Under these circumstances, the admission cannot be challenged on appeal, *see* Fed.R.Evid. 103(a)(1), unless it constituted plain error, *id.* 103(d). Any error in this admission could not be so considered, in view of Vogt's later stipulation to the very fact for whose proof the card was admitted—that Vogt had used an alias in making some purchases of assets relevant to proof of the charges against him.

C

Several challenges to the admission of evidence of post-offense events are made on relevancy and countervailing risk grounds.

Hollye Austin, a co-defendant's secretary, was permitted to testify as a government witness to comments made and trips taken by Vogt that suggested his knowledge of and participation in certain aspects of the illegal conduct charged to him. Evidence of Vogt's use of false identification and aliases was admitted. Photographs of the expensive contents of a Canadian safety deposit box linked to Vogt were allowed in evidence.

[3][4] The admission of each of these items of evidence over objection involved assessments of their relevance under Fed.R.Evid. 401, and of possibly countervailing considerations of the risks of unfair prejudice, confusion, and the like under Fed.R.Evid. 403. These assessments are committed to the broad discretion of trial judges, and no abuse of that discretion can be found here. The first two mentioned were relevant as evidence of a consciousness of guilt, *see, e.g., United States v. Eggleton,* 799 F.2d 378 (8th Cir.1986) (false identification), the last as evidence of an illicit source of wealth, *cf. United States v. Young,* 745 F.2d 733, 753–54 (2d Cir.1984) (narcotics trafficking). Considered separately or cumulatively, all these items of evidence were relevant in varying degrees to critical issues in the case. Even when considered for their cumulative effect, they could not be thought to pose any real risk of unfair prejudice or confusion sufficient to outweigh their probative value. Their admission therefore lay well within the district court's discretion. *See United States v. Masters,* 622 F.2d 83, 87 (4th Cir.1980).

D

[5] The last of Vogt's specific challenges to evidentiary rulings involves the prosecution's elicitation of certain testimony during cross-examination of a defense witness. The prosecutor questioned as follows:

Q. Have you had occasion to meet Mr. Vogt?

A. I met him one time.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Q. When?

A. It was in Guilford County jail. Him and myself, we had a visit.

Vogt immediately moved for a mistrial on the ground that the comment that he had been in jail was impermissibly prejudicial. ***1193** The district court denied the motion, but instructed the jury to "disregard the statements that [the witness] made about any conversations he had with Mr. Vogt." Vogt later requested and received a stronger cautionary instruction that explained that Vogt was being held pretrial because he was a Canadian citizen, not because of any prior convictions.

Vogt now contends that the prejudice caused by the witness' statement was not cured by the cautionary instruction. He argues that the uncured prejudice is demonstrated by the acquittal of both of his co-defendants who were seen "out and about" during trial. In support of his argument, Vogt cites two cases in which convictions were overturned due to careless elicitations of confinement. *See United States v. Warf,* 529 F.2d 1170, 1171 (5th Cir.1976); *United States v. Ratner,* 464 F.2d 169, 172–73 (5th Cir.1972). These cases are distinguishable, however. Both involved elicitations of testimony concerning the defendants' confinement for prior convictions. Here the challenged statement—as carefully explained by the district court in its second cautionary instruction—showed only that Vogt was detained in connection with this case. We are convinced that, on the facts as presented here, it is "highly probable" that the careless elicitation did not affect the judgment in this case; any error in the court's handling was therefore harmless. *United States v. Nyman,* 649 F.2d 208, 211–12 (4th Cir.1980). The matter only came up incidentally, neither the witness nor the prosecution made any repeated reference to it, and the court carefully instructed as to its permissible use. *Id.* at 212; *United States v. Morrow,* 731 F.2d 233, 235 n. 4 (4th Cir.1984).

III

We consider next Vogt's assignments of error going separately to his conviction of the substantive RICO violation charged in Count I.

A

[6] Though it is not his principal challenge on this count, we first consider, because of its importance as background to his other challenges, the sufficiency of the evidence to support the jury's verdict of guilty on this count. Our assessment considers the evidence in the light most favorable to the government and asks whether, considering it in that light, *any* rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

We start with the elements of the offense charged in Count I. The charge was laid under 18 U.S.C. § 1962(a) which provides in relevant part that:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity ... to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

The specific offense charged to Vogt under this section was that:

> From in or about November 1978, up to and including February 25, 1983 ... [he], having received income derived, directly and indirectly, from a pattern of racketeering activity ... did knowingly, willfully, and unlawfully use and invest such income and the proceeds of such income, directly and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

indirectly, in the establishment and operation of the enterprise....

J.A. 33–34.

The pattern of racketeering activity charged was the receipt of the bribe money from Keidaish, eight separate predicate acts of receipt being alleged. The "enterprise" charged consisted of the five corporations earlier identified, which allegedly

functioned as a money laundering operation whereby currency received by [Vogt] from [Keidaish] would be deposited in foreign financial institutions in the Grand Cayman Islands and the Netherland***1194** Antilles, repatriated [sic] into the United States, and invested in properties for [Vogt] ... held in the names of [Vogt], and/or the [enterprise corporations].

J.A. 33.

[7] To prove the offense charged to Vogt under 18 U.S.C. § 1962(a), the government therefore had the burden to prove that (1) Vogt had derived income from a pattern of racketeering activity; (2) that he then used or invested, directly or indirectly, some part of that income in the establishment and operation, (3) of an enterprise, (4) which was engaged in or affected commerce by its activities. *Cf. United States v. Carlock,* 806 F.2d 535, 547 (5th Cir.1986) (comparable summary of elements).

[8] Vogt's challenge to the sufficiency of the evidence on this count is quite narrow. It goes only to the lack of proof that he did in fact use or invest any part of the bribe money or its proceeds in the establishment or operation of the laundering enterprise charged. Appellants' Br. 29–32. He does not challenge the sufficiency of the evidence to prove that he derived income from a "pattern of racketeering activity" by receiving a series of bribe payments from Keidaish. Though at trial his theory of defense was essentially that he did not take any bribe money, hence, by implication, that all proof of what he did with any of his money during the period in issue was simply immaterial, he now concedes, as he must, that Keidaish's direct testimony to the contrary suffices to support a finding against him on that bedrock issue. *Id.* at 29, 30. His contention at this point perforce has become only that there is no direct evidence and insufficient circumstantial evidence to support a finding that, assuming he received the bribe money, he did with it what the indictment specifically charged and § 1962(a) proscribes.

Though he does not expressly concede the point, his argument implicitly concedes, as it must in legal contemplation, that if the evidence supports a finding that he "used or invested" any part of the bribe money or its proceeds in establishing or operating the corporations in the ways charged in the indictment, the same evidence necessarily supports a finding that those corporations constituted and performed the function of the RICO enterprise there charged. Indeed, he makes no other, independent challenge to the sufficiency of the evidence to establish the existence and requisite function of the enterprise charged, *see United States v. Griffin,* 660 F.2d 996, 999 (4th Cir.1981) ("enterprise" may be an "illegitimate" one), nor to its interstate or foreign commerce connection.

In the end, the argument is only that the essentially undisputed evidence of the many transactions involving foreign bank accounts, law firm trust accounts, the "enterprise" corporations and Vogt do not sufficiently show Vogt's own "use or investment" of anything, but only the operation of bona fide corporations in which Vogt participated from time to time in regular course as officer or agent. This argument borders on the frivolous.

Section 1962(a) does not exact rigorous proof of the exact course of income derived from a pattern of racketeering activity into its ultimate "use or invest-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ment." The key operative terms of the section, as specifically charged here, are expansive, not restrictive ones: "use or invest," "any part," "income ... or ... proceeds," "directly or indirectly," "establishment or operation." In combination these broad, disjunctively-phrased terms negate any requirement that the tainted income must be specifically and directly traced in proof from its original illegal receipt to its ultimately proscribed "use or investment" by the defendant. *See* *United States v. Cauble,* 706 F.2d 1322, 1342–43 (5th Cir.1983); *United States v. McNary,* 620 F.2d 621, 628–29 (7th Cir.1980).

Given the statute's deliberately broad reach, the government's proof here easily sufficed to support the jury's finding beyond a reasonable doubt that Vogt did use or invest at least part of the bribe money he received from Keidaish, or some part of the proceeds of that income, in the establishment or operation of the multi-corporation laundering enterprise (or at least some ***1195** portion of it) charged in the indictment. As reference to our earlier summary of some of the key monetary and property transfer transactions reveals, the proof to support that finding was substantial. A brief recapitulation of some aspects of that evidence will suffice to demonstrate this.

Before sale of the Colonial Manor apartments in 1980 netted Vogt and his wife a substantial profit, they had not received from any tax-reported sources any such sums of money as were expended for the purchase of the various assets, including Colonial Manor, which had theretofore been purchased by Vogt or at his direction. Though these assets were routinely titled to one or the other of the various "enterprise" corporations, each indisputably was used at their pleasure by Vogt or members of his immediate family. Several times a purchase transaction had actually occurred before the corporation in whose name the purchased asset was later titled had been formed. While Vogt sometimes purported in these transactions to act merely as agent or representative of the corporation then (or later) involved as title-holder, the jury could have found beyond a reasonable doubt, given the use to which the assets were then put, that the corporations were merely dummies "established or operated" by or in Vogt's behalf for the very purpose of concealing the ultimately illegal source of the funds used to purchase them, *i.e.,* to "launder" those funds. Because Vogt's legitimately acquired net worth, as evidenced by his tax returns, would not have financed all these purchases, the jury could have found beyond a reasonable doubt that they were made at least in part with the money received as bribes from Keidaish, or proceeds of that money. Such a course of conduct, if found by the jury, would as a matter of law constitute the use or investment of illegally derived income or its proceeds in the establishment or continued operation of the very multi-corporate enterprise whose function it was to conceal the original illegal source of the funds. *Cf.* *Cauble,* 706 F.2d at 1342; *McNary,* 620 F.2d at 628–29.

We therefore reject Vogt's challenge to the sufficiency of the evidence to support the guilty verdict on Count I.

B

Vogt's principal challenges to his conviction on Count I go to the district court's refusal to find the prosecution of that count time-barred. He makes two contentions. First, that prosecution was time-barred on the face of the indictment, so that his timely pre-trial motion to dismiss the indictment on that basis was erroneously denied. Second, alternatively, that if not facially barred, it was barred by the government's failure to prove commission of the offense within the statutory period, so that his timely pre- and post-verdict motions for judgment of acquittal on that basis were erroneously denied.

We consider these in order.

(1)

[9] The RICO statute does not contain its own

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

statute of limitations. Criminal RICO prosecutions therefore are governed, as all here concede, by the catch-all, five-year federal statute of limitations in 18 U.S.C. § 3282. *See Agency Holding Corp. v. Malley–Duff Assoc.,* 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). The superseding indictment charging Count I was returned on January 5, 1987. The charging period therefore ran back to January 5, 1982. The indictment charged a pattern of racketeering activity consisting of eight predicate acts of taking bribes between December 1976 and August 1978; it charged acts of use and investment of the bribe money and its proceeds for a period extending to February 25, 1983. J.A. 33–34.

Vogt's contention is that the statute began to run from the date of the last predicate act of racketeering charged, *i.e.,* in August 1978, so that the prosecution which was commenced over five years later, in 1987, was facially time-barred. The district court rejected this contention, holding that with respect to prosecutions under subsection (a), the statute begins to run upon the last act of "use or investment" of illegally ***1196** derived funds or their proceeds in the "establishment or operation" of an enterprise. Because the indictment charged such acts of use or investment as late as February 25, 1983, well into the charging period, the prosecution was not facially barred.

So far as we are advised, no federal court has ruled directly on the question of when the five-year statute of limitations begins to run for prosecutions under § 1962(a). Several circuits have held, and we may assume correctly for purposes of this appeal, that the statute does begin to run from the date of the last predicate act of racketeering charged in prosecutions under § 1962(c), which proscribes the "conduct of [an] enterprise's affairs through a pattern of racketeering activity." *See, e.g., United States v. Torres–Lopez,* 851 F.2d 520 (1st Cir.1988); *United States v. Persico,* 832 F.2d 705 (2d Cir.1987); *United States v. Bethea,* 672 F.2d 407 (5th Cir. Unit B 1982).[FN2] The district court thought that triggering rule not applicable to prosecutions under subsection (a) because of critical differences between the conduct separately proscribed by the two subsections.

> FN2. Vogt incorrectly asserts in his briefs that "the courts uniformly," and those cited decisions in particular, have held that the triggering event under all three substantive subsections of § 1962, (a)–(c), is the last predicate act of racketeering activity. Appellant's Br. 16, 17; Appellant's Reply Br. 6. The cited cases all dealt only with subsection (c) prosecutions, and the opinions nowhere touch upon the applicable rule for subsections (a) and (b). The only case brought to our attention which has suggested such a uniform rule for all three subsections is *Bankers Trust Co. v. Rhoades,* 859 F.2d 1096, 1102 (2d Cir.1988), a civil case applying a quite different accrual-triggering rule (date of plaintiff's injury) in which the suggestion appears as sheer dictum.

Simply put, the gravamen of the offense defined in subsection (c) is conduct which by definition is necessarily exactly coincident in time with the continuation of a pattern of racketeering activity. For the specific conduct proscribed is that of conducting an enterprise *through* a pattern of racketeering activity. Once that pattern of activity is ended, the offense under subsection (c) is complete. The enterprise may continue on, but it is no longer being conducted *through* the pattern of racketeering activity. The triggering event under subsection (c) may therefore rightly be identified as the last predicate act making up the pattern of racketeering activity because that also marks consummation of the conduct proscribed.

By contrast, the gravamen of the offense defined in subsection (a) is conduct that need not (though it could) be exactly coincident in time with the continuation of the pattern of racketeering activity which is an element of that offense as well. For the conduct

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

proscribed in subsection (a) is that of using or investing funds, or the proceeds of funds, derived *from* the pattern of racketeering activity. Such a use or investment obviously need not occur, and here was not charged to have occurred, during the continuation of the pattern of racketeering activity. Unlike the offense defined in subsection (c), therefore, that defined in subsection (a) is not necessarily consummated by the last predicate act of racketeering activity. Instead, it is only consummated by the quite separate act of use or investment, hence the statute with respect to subsection (a) is only triggered by the last such act charged.

We think the district court's analysis, which we have here recast in our own paraphrase, is sound. Vogt makes two policy arguments against adopting the rule that this analysis produces.[FN3] First, he ***1197** urges the virtue of having a uniform triggering event for all three of the substantive RICO offenses defined in subsections (a), (b), and (c). Second, he points to the potential that it creates for confusion as courts attempt to decide what acts constitute "use or investment" in the "establishment or operation" of an enterprise. We are not persuaded by either of these arguments.

FN3. Vogt also makes a technical argument against the rule by drawing on language in some circuit decisions to the effect that "[t]he provisions of section 1962 do not create 'new crimes' but serve as the prerequisites for the invocation of increased sanctions for conduct which is proscribed elsewhere," *United States v. Neapolitan,* 791 F.2d 489, 495 (7th Cir.1986), and that "RICO does not criminalize conduct that was legal before its enactment." *United States v. Cauble,* 706 F.2d 1322, 1330 (5th Cir.1983). His argument from these broad generalizations seems to be that nothing except the predicate acts of racketeering activity defined in § 1961(1) are to be considered as essential elements of the specific crimes defined in subsections (a)–(c), and that all other seeming elements may therefore be simply disregarded in assessing for triggering (or guilt?) purposes when the crimes defined in these subsections have been committed. On this view then, a defendant's "use or investment" of income derived from the pattern of predicate acts which constitute the "already existing" crimes on which RICO is solely built is irrelevant to the question of when a subsection (a) offense has been committed.

Simply to parse this argument reveals that it seeks to make more of the quoted generalizations than they will bear, and perhaps that the generalizations themselves are ones that might bear rethinking or more cautious use.

[10][11] The virtue of uniformity cannot of course be gainsaid as a general matter, but it cannot in the end override statutory text which simply prevents it. To force uniformity here would fly in the face of the most trustworthy and predictable triggering rule for criminal prosecutions that we have, that the statute of limitations only begins to run from the date of the last act or occurrence required to complete a crime. *See Pendergast v. United States,* 317 U.S. 412, 418, 63 S.Ct. 268, 270, 87 L.Ed. 368 (1943). [FN4] As indicated, while the crime defined in subsection (c) is complete upon the cessation of the pattern of racketeering activity *through* which an enterprise's affairs are being conducted, the offense defined in subsection (a) is only complete upon the use or investment of income, or its proceeds, derived from such a pattern. A prosecution under subsection (a) therefore could not proceed until such use or investment had occurred, without regard to when the pattern of racketeering activity which produced the tainted income may have come to an end. The different structures of the offenses defined in these two subsections simply does not permit uniformity of treatment.[FN5]

FN4. When the legislatively intended "unit

of prosecution" under a criminal statute is a "course of conduct" rather than a "multiplicity of offenses" making up the conduct, *see United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221–26, 73 S.Ct. 227, 229–31, 97 L.Ed. 260 (1952), the limitations triggering event is perforce the concluding act in the course of conduct alleged. Subsection (a) plainly contemplates as its proper unit of prosecution a "course of conduct," *i.e.,* the "investment or use" of proceeds in the "operation" of an enterprise, rather than each separate act of investment or use. It is this feature which makes possible the charging here of acts of "use and investment" extending into the charging period.

FN5. This is not the only respect in which uniformity of application of key RICO concepts as between subsections (a) and (c) has been found not warranted because of the different structures of the two subsections. *See Busby v. Crown Supply, Inc.,* 896 F.2d 833, 840–42 (4th Cir.1990) (en banc) (while under subsection (c) a defendant and the enterprise must be separate entities, under subsection (a) they may be the same).

Vogt's argument that such a triggering rule will produce confusion and be unenforceable focuses on the indeterminacy of the critical subsection (a) concepts of "use," "invest," "establishment," and "operation." The short and sufficient answer is that courts must necessarily interpret and apply those key concepts in resolving, or submitting for resolution, the issue of guilt itself under this subsection. Interpreting and applying them for limitation purposes poses no greater or different problem.

We therefore reject Vogt's contention that the district court erred in refusing to dismiss the indictment as facially time-barred.

(2)

[12] Vogt's alternative contention is that, even if the prosecution was not facially time-barred under his theory of the applicable triggering event, it should have been found time-barred by the insufficiency of the evidence to prove an act of use or investment of tainted funds within the charging period. This contention has been attended by great confusion throughout the litigation process and that confusion persists on this appeal.

At trial, Vogt raised this issue in two ways. First, by motions at the close of the evidence and after verdict for judgment of acquittal for insufficiency of the evidence ***1198** to support a finding of timeliness. Second, by requesting a jury instruction requiring proof by the government of an act of investment or use within the charging period. Both were denied by the district court. The issue of the sufficiency of the evidence is clearly before us, having been properly raised in Vogt's main brief. The jury instruction issue is not clearly before us. There is a serious question whether it was properly preserved for review by a sufficiently specific objection at trial under Fed.R.Crim.P. 30. Beyond that, there is the further question whether, even if so, it has been properly raised on this appeal. It was not identified as an issue in Vogt's main brief, *see* Fed.R.App.P. 28(a)(2), but was only sought to be raised in rebuttal in his reply brief. This ordinarily will not suffice, *see* 9 J. Moore & B. Ward, *Moore's Federal Practice* ¶ 228.02[2.–1] (1990), and we would be justified on this basis alone in declining to consider it as a separate issue.

In any event, we need not invoke procedural waiver, because we are satisfied that the same analysis which demonstrates the sufficiency of the evidence to support a finding of timeliness demonstrates that any error in refusing the requested instruction was harmless.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Vogt's argument is that there was insufficient evidence to support a finding beyond a reasonable doubt that any acts by him of use or investment of tainted funds or their proceeds occurred after January 5, 1982. He attempts to narrow this issue by seizing upon the government's identification of only three such specific acts in its brief, and then challenging weaknesses in the evidence related to each.[FN6] The government's imprecision in its brief may have invited this narrowly focussed challenge, but it obviously does not limit our assessment of the overall sufficiency of the evidence. Indeed, the government's brief simply instanced these as examples, "among other things," of acts of use or investment within the charging period. Appellee's Main Br. 23. Even if we were to put aside the three specific instances cited, we agree with the government that there is abundant evidence of "other things" occurring after January 5, 1982, to support a finding of timeliness.

FN6. The three transactions specifically instanced by the government were (1) the payment in October 1982 of the annual installment due on the Greensboro residence by attorney Ray in behalf of Real Tech Int'l, the then title-holder; (2) a March 1982 payment of an insurance premium due on properties titled to Real Tech Int'l; and (3) an April 1982 payment of hangar rent on an airplane purchased for Vogt's use but titled to Continental Aero Marine, Inc., another of the alleged enterprise corporations.

Vogt's attack on these three is his general one that the evidence is insufficient to prove Vogt's control of these transactions rather than that of the corporate title-holder involved. He also attacks the last on the basis that the district court, considering related forfeiture issues without a jury, found the evidence not sufficient to prove beyond a reasonable doubt that Continental Aero Marine functioned as an element of the laundering enterprise.

While we believe, for reasons developed in text, that the evidence sufficed to support a finding of Vogt's direct control of each of these transactions, we also think them not necessary to support a finding of timeliness because of other transactions within the charging period.

Before identifying these, it will be helpful to recapitulate our earlier determinations respecting the sufficiency of the evidence to support findings of Vogt's culpable use or investment of tainted funds in connection with the general issue of his guilt. First, the sufficiency of the evidence to support a finding that Vogt derived substantial income from a pattern of racketeering activity between 1976 and 1978 is conceded. Next, there is no challenge to the sufficiency of the evidence to establish that the many transactions documented by the government's proof, including those within the charging period, actually occurred. We have now concluded that the evidence was sufficient to support the further critical inference from these conceded or unchallenged facts that the asset purchases and transfers effected in these transactions were effected directly by or in behalf of Vogt, rather than by the various "enterprise" corporations acting independently of Vogt; that in these transactions the corporations were simply used as dummies or *alter egos* of Vogt specifically to conceal the source of his tainted funds; and that the funds and assets involved in ***1199** all of the transactions proven were, at least in part, either income or the proceeds of income derived from the 1976–78 pattern of racketeering activity.

All of this of course applies to whatever transactions involving Vogt and different ones of the enterprise corporations were proven to have occurred after January 5, 1982, as well as before. We need point to only a few of the charging-period transactions.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

In July of 1982, the Bluebird mobile home that had been bought and used by Vogt personally, but was titled to Costalotta, Inc., was sold by Vogt to Mitchell, who gave a cashier's check for $185,000 payable to Costalotta, Inc., which was then endorsed to and deposited by Real Tech Int'l in the Bank of Nova Scotia account.

In August of 1982, the Sea Ray motorboat that had been purchased in 1980 at a cost of $63,232 for Vogt's private use, but was titled to Real Tech Int'l, was sold by Real Tech Int'l to provide funds for Vogt.

In early 1983, the Greensboro residence to which Real Tech held title following Vogt's purchase of the property from Mitchell in 1979 was "sold" by Real Tech in a sham transaction to Vogt's parents.

These charging-period transactions, like various earlier ones, involved, as the jury necessarily found, "use" by Vogt of the "proceeds" of the originally tainted "income" in the "operation" of the multi-corporation laundering enterprise. On the government's sound theory of subsection (a)'s intended application, every time tainted funds or assets purchased with tainted funds were run into or out of one of the enterprise corporations by or at Vogt's direction, this constituted a "use" by him of those funds or their proceeds in the "operation" of the enterprise in its intended function, which was precisely to serve as a concealing conduit or repository of the funds or assets. [FN7] Because, as indicated, Vogt has never disputed that these charging-period transactions occurred, the only basis upon which their conceded occurrence would not suffice as evidence of culpable conduct within the charging period is if the evidence were insufficient to support the further finding that they were acts of Vogt rather than of the corporation. As earlier concluded, the evidence overwhelmingly sufficed to support the jury's necessary finding that this repeated transactional pattern, whenever it occurred, involved Vogt as the prime mover, with the enterprise corporations serving as mere dummies or *alter egos* in their intended laundering function. We therefore conclude that the evidence sufficed to prove the timeliness of the prosecution by proving culpable acts of use or investment within the charging period.

> FN7. Vogt's challenge to the sufficiency of the evidence on this point is rested largely on an emphasis upon the narrowness of the concepts of "investment" of tainted funds in the "establishment" of an enterprise. This emphasis of course glosses over the obviously broader alternative concepts of the "use" of such funds in the "operation" of an enterprise. Both factual theories were charged and properly submitted to the jury. Focussing mainly on the limited notion expressed in the "investment" of funds alternative, Vogt argues technically that transactions in which enterprise corporations sold assets or transferred funds constituted "divestments" rather than "investments." As our discussion in text shows, this completely sidesteps the significance of such transactions as evidence of Vogt's "use" of tainted funds or the proceeds of those funds in the "operation" of an enterprise whose function was alleged and proven to be acting as repository or conduit for tainted funds in order to conceal their ultimate source and beneficial ownership.

[13] The above analysis demonstrates that the only disputed factual issue respecting the occurrence of culpable conduct within the charging period was necessarily subsumed within the general issues going to Vogt's guilt. These were properly submitted to the jury and answered against Vogt on evidence sufficient to support the verdict. This either made unnecessary the submission of a special issue related to charging period occurrences, hence to the timeliness of the prosecution, *cf. United States v. Head,* 641 F.2d 174, 178 (4th Cir.1981) (special instruction on timeliness of prosecution required where evidence leaves it in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

issue), or in any event made harmless any error in declining to submit such an issue.

***1200** C

[14] Vogt's final argument respecting Count I is that the district court erroneously instructed the jury on the requirement that the government prove a “pattern of racketeering activity.” We agree that the instruction was erroneous but hold that the error was harmless.

The court instructed the jury that it “need not find that there was any connection or relation between the racketeering acts,” further instructing that the jury need “only find that the defendant ... derived income from at least two of the charged racketeering acts committed within ten years of each other.” Although this is clearly at odds with current law, *see Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985) (“The legislative history supports the view that two isolated acts of racketeering activity do not constitute a pattern.”), it could not have made a difference on the facts of this case. The only predicate acts charged in the indictment were eight violations of 18 U.S.C. § 201(c)(3), which prohibits the receipt of bribes by public officials. All of the acts charged occurred between December 1976 and August 1978 and involved the same bribe payment transactions between the same parties—Vogt and Keidaish. Therefore, any pattern found by the jury must have been drawn from these obviously related acts. The court's erroneous instruction was therefore harmless.

IV

We next consider Vogt's several assignments of error respecting Count III, the *Klein* conspiracy count.

A

We take first an argument raised for the first time after submission of the case following oral argument. We decided to consider it, despite its belatedness, out of an abundance of caution, due to its fundamental nature, and invited supplemental briefing while holding the appeal in abeyance.

The contention is that Count III of the indictment is insufficient to state a crime under 18 U.S.C. § 371 which proscribes, in relevant part, “conspir [acy] either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose....” Count III of the indictment charged that Vogt and others

> did conspire ... to commit offenses against the laws of the United States by impeding, impairing, obstructing and defeating the lawful functions of the United States Department of the Treasury, Internal Revenue Service, in the ascertainment, computation, assessment and collection of revenue, that is, federal income taxes.

Section 371, though written as one criminal statute, proscribes two types of conspiracies. The first is a conspiracy to commit a substantive offense proscribed by other statutes. *See United States v. Vazquez,* 319 F.2d 381, 384 (3d Cir.1963). The second, completely defined in § 371, is a conspiracy to defraud the United States. An indictment drawn under this latter portion of the statute need refer to no statute other than § 371.

The government's indictment in this case fails to refer to any other statute that Vogt allegedly conspired to violate, and the government does not argue that the indictment was brought under § 371's first clause. Vogt argues that, because the indictment nowhere specifically states that the government was defrauded, the indictment was similarly inadequate under the “defraud” clause.

Vogt relies on *United States v. Hooker,* 841 F.2d 1225, 1230–31 (4th Cir.1988), for the proposition that, lacking an essential element of the crime, this indictment does not support the exercise of jurisdiction

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

over the prosecution. As noted, Vogt never raised this issue at any time during trial, and indeed not until several months *after* oral argument. *Hooker* and the other cases Vogt relies upon do not support his contention. In those cases, the defendants' challenges to the indictment all occurred pre-verdict and therefore triggered a stricter***1201** scrutiny of the indictments' sufficiencies. *See Hooker,* 841 F.2d at 1230; *United States v. Pupo,* 841 F.2d 1235, 1237 (4th Cir.1988). *See also United States v. Zangger,* 848 F.2d 923, 924 (8th Cir.1988). Indeed, each of the cited cases from this circuit expressly states that, had the defendant made a pre-verdict challenge to the indictment, the appellate court would have applied a different standard in assessing its jurisdictional sufficiency. *See, e.g., Hooker,* 841 F.2d at 1228–29; *Pupo,* 841 F.2d at 1239 ("As we stated in *Hooker,* when an indictment fails to include an essential element of the offense charged ... a conviction under the indictment may not stand, provided the omission is timely raised ... at any time prior to verdict.").

[15][16] When a post-verdict challenge to the sufficiency of an indictment is made, "every intendment is then indulged in support of ... sufficiency." *Finn v. United States,* 256 F.2d 304, 307 (4th Cir.1958). The question then is "only whether 'the necessary facts appear in any form, or by a fair construction can be found within [its] terms.' " *Id.* at 306 (quoting *Hagner v. United States,* 285 U.S. 427, 433, 52 S.Ct. 417, 420, 76 L.Ed. 861 (1932)). Where the post-verdict challenge to the indictment relates to the absence of an element, the indictment will be held sufficient if it contains "words of similar import." *Id.* (emphasis deleted).

[17] We conclude that Count III meets that liberal test. Count III alleges that the object of the conspiracy was

> impeding, impairing, obstructing and defeating the lawful functions of the United States Department of the Treasury, Internal Revenue Service, in the ascertainment, computation, assessment and collection of revenue, that is, federal income taxes.

J.A. 48–49. Further, the section of the indictment entitled "Methods and Means" sets forth the specific acts of alleged fraud, *viz.,* causing to be filed false tax returns as well as allegations of money laundering for the purpose of concealing income. *See* J.A. at 49–50. A "fair construction" of the terms of the indictment charging Vogt with "impeding, impairing, obstructing and defeating" the Internal Revenue Service, when coupled with the specific allegations of money laundering and false tax returns, presented the " 'necessary facts ... within [the] terms' of the [indictment] ... to state an offense," *Finn,* 256 F.2d at 306–07 (citation omitted), under 18 U.S.C. § 371's defraud clause.

We therefore reject this belated challenge to the sufficiency of the indictment to charge an offense in Count III.

B

Vogt next contends that prosecution of Count III was time-barred. We disagree.

[18][19] *Klein* conspiracies are governed by a six-year statute of limitations. *See* 26 U.S.C. § 6531(1) & (8); *United States v. White,* 671 F.2d 1126, 1133–34 (8th Cir.1982). Therefore, assuming that the statute was tolled by the superseding indictment on January 5, 1987, and that a *Klein* conspiracy requires proof of an overt act in furtherance of the conspiracy within the applicable six years, the government must have alleged and proven that Vogt committed an overt act in furtherance of the conspiracy after January 5, 1981. Vogt argues that such proof here is an impossibility because, under *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957), a *Klein* conspiracy's objectives are attained on the date the allegedly inaccurate tax returns are filed (or due if they are not filed)—in this case, on April 15, 1979. Any acts after that date, he contends, cannot have been "in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

furtherance" of the *Klein* conspiracy, but could only be in furtherance of an uncharged, separate, subsidiary conspiracy to conceal the object of the completed conspiracy. Under this reasoning prosecution for the *Klein* conspiracy is time-barred.

Vogt misconstrues *Grunewald.* As the Supreme Court later clarified in *Forman v. United States,* 361 U.S. 416, 422–24, 80 S.Ct. 481, 485–86, 4 L.Ed.2d 412 (1960), *overruled in part on other grounds, Burks v. United States,* 437 U.S. 1, 17–18, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978), the ***1202** reasoning in *Grunewald* was tied to the indictment in that case which alleged that one object of the charged conspiracy was to conceal the acts of the conspirators. In essence then, the *Grunewald* indictment specifically charged a separate, subsidiary conspiracy. The *Forman* Court, however, considered an indictment that alleged a single, ongoing conspiracy to deprive the government of taxes—precisely like that charged in this case. [FN8]

FN8. The indictment alleges that from January 1976 to June 1983 Vogt and others conspired "to commit offenses against the laws of the United States by impeding, impairing, obstructing and defeating the lawful functions of the Internal Revenue Service, in the ascertainment, computation, assessment and collection of revenue, that is, federal income taxes." J.A. 48–49. In *Grunewald,* the indictment alleged that as part of the conspiracy, the defendants and co-conspirators would (1) "make continuing efforts to avoid detection and prosecution by any governmental body" and (2) "misrepresent, conceal and hide and cause to be misrepresented, concealed and hidden, the acts done pursuant to and the purposes of said conspiracy." 353 U.S. at 394 n. 3, 77 S.Ct. at 968 n. 3.

> The petitioner says that the theory on which the case was submitted to the jury was that the conspiracy to attempt to evade the taxes "was consummated" when the income tax returns for 1945 were filed and that, unless the jury found "a subsidiary conspiracy" to conceal the conspiracy to attempt to evade the taxes, the "verdict would have to be not guilty." ... The correct theory ... was indicated by the indictment, i.e., that the conspiracy was a continuing one extending from 1942 to 1953 and its principal object was to evade the taxes ... for 1942–1945 ... by concealing their "holdout" income. This object was not attained when the tax returns for 1945 concealing the "holdout" income were filed. As was said in *Grunewald,* this was but the first step in the process of evasion. The concealment of the "holdout" income must continue if the evasion is to succeed. It must continue until action thereon is barred and the evasion permanently effected.

*Forman,* 361 U.S. at 423–24, 80 S.Ct. at 486.

Contrary to Vogt's argument, the conspiracy charged in this case survives the tax return filing deadlines and the jury's verdict of guilty accordingly survives this challenge if the government showed an overt act in furtherance of this ongoing conspiracy within six years of the indictment. As discussed at length in Part III–B(2), the record abounds with evidence of overt acts by Vogt specifically designed to conceal his source of unreported income well into the six-year charging period.

C

Vogt's final argument concerning the *Klein* conspiracy is that the evidence at best sufficed to prove a conspiracy to conceal the *source* of the unreported income, not a conspiracy to impede the IRS in the ascertainment and collection of income taxes upon it. We disagree.

[20] We recognize, of course, that *Klein* applies only when an agreed upon objective of the criminal conspiracy is to thwart the IRS's efforts to determine and collect income taxes. *United States v. Krasovich,* 819 F.2d 253, 255–56 (9th Cir.1987); *United States v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Enstam,* 622 F.2d 857, 861 (5th Cir.1980). If impeding the IRS is only a collateral effect of an agreement, rather than one of its purposes, then a conviction for a *Klein* conspiracy cannot stand. We conclude, however, that the evidence sufficed to support the jury's finding that one purpose of the conspiracy here alleged was to conceal the illegally gained income to avoid taxation.

[21][22] A *Klein* conspiracy is comprised of three elements: "(1) the existence of an agreement, (2) an overt act by one of the conspirators in furtherance of the [agreement's] objectives, and (3) an intent on the part of the conspirators to agree, as well as to defraud the United States." *United States v. Shoup,* 608 F.2d 950, 956 (3d Cir.1979). The offense comprehends " 'any conspiracy for the purpose of impairing, obstructing, or defeating the lawful function of any department of government.' " *Id.* at 964 (quoting *Dennis v. United States,* 384 U.S. 855, 861, 86 S.Ct. 1840, 1844, 16 L.Ed.2d 973 (1966)). Although***1203** several courts have specifically reserved the question of whether conspiring merely to conceal the source of income is illegal under *Klein,* the same courts sustained *Klein* convictions because the evidence sufficed to prove an accompanying "intent and purpose of impeding and obstructing the IRS in the collection of revenue and the performance of its duties." *United States v. Montalvo,* 820 F.2d 686, 690 (5th Cir.1987). *See also United States v. Browning,* 723 F.2d 1544, 1549 (11th Cir.1984); *Enstam,* 622 F.2d at 863. The government's evidence in this case supports such a finding.

It shows that Vogt's federal income tax returns from 1976 to 1983 did not reflect any of the bribe monies he received from Keidaish. The evidence also shows that from 1979 to 1983, Vogt acquired property interests in North Carolina and Florida and substantial assets, often placing title in various off-shore or domestic corporations, using large sums of cash, his attorneys' law firm's trust account checks, or official checks of off-shore banks. In 1978, when Vogt paid $100,000 cash in partial payment for a piece of property, he directed the seller to deposit the funds in less than $10,000 increments "[s]o there wouldn't have to be any banking forms filled out." Other evidence shows that Vogt and an alleged co-conspirator, through another trust account, paid monthly rental payments and insurance premiums on various enterprise assets. All of this evidence—inaccurate and false tax returns, other indications of tax evasion, and continuous concealment in a deceitful way—provides a sufficient basis for Vogt's conspiracy conviction. *See United States v. Tedder,* 801 F.2d 1437, 1446 (4th Cir.1986). *See also Montalvo,* 820 F.2d at 690–91; *Klein,* 247 F.2d at 917.

[23] One question, however, remains. To convict Vogt of participating in a *Klein* conspiracy, the government must also show *an agreement* between Vogt and at least one other to impede the IRS. *United States v. Mulherin,* 710 F.2d 731, 737 (11th Cir.1983); *United States v. Anderson,* 611 F.2d 504, 511 (4th Cir.1979). Vogt argues that his conviction for participation in the *Klein* conspiracy must fall because all of the co-conspirators named in the indictment were acquitted on the conspiracy count, and the government cannot therefore prove the requisite agreement. We do not agree. As we recently held in *United States v. Thomas,* 900 F.2d 37, 40 (4th Cir.1990) (citing *United States v. Andrews,* 850 F.2d 1557, 1561 (11th Cir.1988) (en banc)), even where all but one of the charged co-conspirators are acquitted, the verdict against the one may nevertheless stand. As noted in *Thomas,* recent decisions, including a number of Supreme Court decisions, have effectively undercut the old common law rule which protected criminal defendants against conviction on an "inconsistent" verdict. Sufficient protection against "jury irrationality or error" is now considered to lie in " 'independent review of the sufficiency of the evidence.' " *Thomas,* 900 F.2d at 40 (quoting *Andrews,* 850 F.2d at 1562). Here, sufficient evidence exists of a conspiracy between Vogt and his acquitted co-conspirators to uphold the jury's verdict against Vogt.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

We therefore reject Vogt's argument that his conviction on Count III should be overturned because his co-conspirators were acquitted on that count.

AFFIRMED.

C.A.4 (N.C.),1990.
U.S. v. Vogt
910 F.2d 1184, 30 Fed. R. Evid. Serv. 743

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.